In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00162-CV


______________________________




BELINDA A. ZANFARDINO, Appellant



V.



HUGH L. JEFFUS, JR., MARSHALL TURNER JEFFUS, AND 


NANALEE MAY JEFFUS NICHOLS, Appellees






On Appeal from the 6th Judicial District Court


Lamar County, Texas


Trial Court No. 68707








Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 In 1952, John Antone and his daughter, Virginia Antone, (the Antones) owned two tracts of
land, one consisting of 598.73 acres in Lamar County and the other consisting of 281.73 acres in Red
River County. The Antones borrowed approximately $20,000.00 from Banker's Life Insurance
Company (Banker's) and used the 598.73-acre tract in Lamar County as collateral. In 1953, the
Antones borrowed an additional $13,860.00 from Deport State Bank (Deport). As collateral for the
second loan, the Antones placed the 281.73-acre tract in Red River County and 386.25 acres of the
tract in Lamar County into a deed of trust, making Deport a second lienholder with respect to the
386.25 acres located in Lamar County. The deed of trust named Tom Jeffus, in his individual
capacity, as trustee. (1) 

 In 1955, the Antones defaulted on the second loan and deeded both tracts to Tom Jeffus in
his individual capacity. In exchange, Tom Jeffus agreed to assume all of the Antones' outstanding
debt to Banker's and Deport, and the Antones retained a vendor's lien on the property until both loans
had been paid. In order to pay the debt owed to Deport, Tom Jeffus sold the 281.73-acre tract in Red
River County to Joe Antone, John Antone's brother, for $9,913.40. (2) After receiving the proceeds
from that sale, Deport issued a partial release of lien and declared the obligation paid. Further, in
1962, Tom Jeffus procured a loan from Prudential Insurance Company and gave the Lamar County
tract as collateral for that loan. The proceeds from that loan were used to pay the outstanding debt
owed to Banker's. Accordingly, on January 25, 1962, Banker's executed a release of its lien on the
Lamar County tract and declared its Antone obligation paid. Through a series of payments made by
Tom Jeffus and his successors, Prudential executed a release of its lien on the Lamar County tract
in 1980.

 In 1999, Belinda A. Zanfardino, daughter of Virginia Antone and granddaughter of John
Antone, came under the impression, after reviewing the documentation of the above transactions,
that Tom Jeffus had fraudulently induced her mother and grandfather into deeding those tracts to
him. (3) Accordingly, Zanfardino contacted the title company to assert her claim to the property. At
that time, the Lamar County tract was in the possession of Tom Jeffus' grandson, Hugh L. Jeffus, Jr.
(Appellee). Appellee claims that, because Zanfardino created a cloud on the title, Appellee was
unable to sell the tract. Appellee brought this suit against Zanfardino to clear title and to seek
damages for loss of sale. Zanfardino defended on the basis of fraud.

 Appellee filed a motion for summary judgment asserting (1) his legal title was undisputed,
and (2) there was no evidence Zanfardino had any claim to the title. In his motion for summary
judgment, Appellee argued his title was good as a matter of law because there was no evidence
supporting Zanfardino's fraud claim and any such claim would be barred by limitations and adverse
possession.

 The trial court granted a partial summary judgment in favor of Appellee on the title issue and
severed Appellee's slander of title claim against Zanfardino, making the summary judgment final and
appealable. On appeal, Zanfardino asserts summary judgment was improper because fact issues exist
as to: (1) whether the land had been acquired fraudulently, (2) whether the statute of limitations
barred Zanfardino's claims, and (3) whether Appellee had a valid adverse possession claim. We
affirm.

 On appeal, summary judgment is reviewed de novo in accordance with the following
standards: (1) the movant has the burden of showing that there is no genuine issue of material fact
and that the movant is entitled to judgment as a matter of law; (2) in deciding whether there is a
disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will
be taken as true; and (3) every reasonable inference and any doubts must be resolved in the
nonmovant's favor. Limestone Prods. Distrib., Inc. v. McNamara, 71 S.W.3d 308, 311 (Tex. 2002). 
A no-evidence motion for summary judgment is essentially a pretrial directed verdict, so we apply
the same standard of review as in reviewing a directed verdict, viewing all evidence in the light most
favorable to the nonmovant and disregarding all contrary evidence and inferences. King Ranch, Inc.
v. Chapman, No. 01-0430, 2003 Tex. LEXIS 242, at *16 (Tex. Aug. 28, 2003); Merrell Dow
Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).

 [A] no-evidence summary judgment is improperly granted if the respondent brings
forth more than a scintilla of probative evidence to raise a genuine issue of material
fact. Tex. R. Civ. P. 166a(i); Wal-Mart, 92 S.W.3d at 506. Less than a scintilla of
evidence exists when the evidence is "so weak as to do no more than create a mere
surmise or suspicion" of a fact. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex.
1983). More than a scintilla of evidence exists when the evidence "rises to a level
that would enable reasonable and fair-minded people to differ in their conclusions." 
Merrell Dow Pharms., 953 S.W.2d at 711.


Chapman, 2003 Tex. LEXIS 242, at *17.


 When the order granting summary judgment fails to specify the reason for granting the
motion, an appellant must show that each individual ground for summary judgment raised in the
motion would be insufficient to support summary judgment. FM Props. Operating Co. v. City of
Austin, 22 S.W.3d 868, 872 (Tex. 2000). On the other hand, summary judgment must be affirmed
if any of the grounds raised in the motion are meritorious. Id. We hold each of the three grounds
were meritorious.

 Zanfardino contends Tom Jeffus defrauded the Antones out of the property and, furthermore,
as trustee under the deed of trust, owed a fiduciary duty to the Antones. Zanfardino also contends
Tom Jeffus was guilty of self-dealing because he took both the Red River and Lamar County tracts
personally, instead of in his representative capacity for Deport.

 To establish a fact question on her fraud claim, Zanfardino must have presented more than
a scintilla of competent summary judgment evidence of each of the following elements of fraud:
(1) that Tom Jeffus made a material, false representation, (2) that he knew was false or that he made
recklessly as a positive assertion without any knowledge of its truth, (3) intending to induce the
Antones to act on the representation, and (4) on which the Antones actually and justifiably relied,
thereby suffering injury. See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577
(Tex. 2001). We have carefully examined the summary judgment evidence and find no evidence to
raise a fact question as to any of those elements of a fraud cause of action. Therefore, there is no
evidence to support Zanfardino's fraud claim. (4)

 In Zanfardino's "Affidavit of Fact" offered to resist Appellee's motion for summary judgment,
she offered various statements which might be argued were evidence of fraud. Each statement that
might be argued to tend to prove that Tom Jeffus defrauded the Antones, however, was either
conclusory, speculative, hearsay, or simply not evidence of any element of such a fraud claim. 
Before the trial court, Appellee objected to Zanfardino's affidavit in its entirety.

 Zanfardino claims Tom Jeffus fraudulently procured the property by taking more land than
was necessary to pay the debt owed to Deport. Specifically, Zanfardino claims Tom Jeffus
misrepresented the value of the land secured by the deed of trust and convinced the Antones to deed
both tracts in exchange for his assumption of their debts. First, the only language in the summary
judgment evidence suggesting that the sale of the Red River County tract would have been sufficient
to satisfy the outstanding balance owed to Deport was the following statement made by Zanfardino
in her affidavit: 

 On May 7, 1955, my Grandfather and Mother drove from Dallas to [Deport] to pay
their three notes in full. They met with the President of the Bank and Trustee, Tom
Jeffus. When the Antones left their apartment in Dallas that morning, they did not
believe they would have to deed all of their land to the Bank. They believed that the
land in Red River County and the herd of cattle covered by the Chattel mortgage
would satisfy the balance at the Bank.


Zanfardino's statement is both hearsay and conclusory, and it is insufficient to raise a genuine issue
of material fact. See Tex. R. Evid. 801; Life Ins. Co. v. Gar-Dal, Inc., 570 S.W.2d 378 (Tex. 1978);
Gracey v. West, 422 S.W.2d 913, 916 (Tex. 1968).

 There is no evidence in the record that Tom Jeffus ever made any representations to the
Antones concerning the value of the two tracts. The only proposal found in the record was that Tom
Jeffus agreed to assume the Antones' debts to Banker's and Deport in exchange for the Lamar and
Red River County tracts. An agreement to assume a debt is a prospective promise to perform, not
a misrepresentation of fact that could support a fraud claim unless accompanied by proof that, at the
time of the promise, the promisor intended not to perform. Cent. Sav. & Loan Ass'n v. Stemmons
Northwest Bank, N.A., 848 S.W.2d 232, 240 (Tex. App.-Dallas 1992, no pet.). There is no such
evidence in this record.

 In support of her contention that Tom Jeffus' position as trustee under the deed of trust
created a confidential relationship between him and the Antones, Zanfardino relies on First Fed. Sav.
& Loan Ass'n v. Sharp, 359 S.W.2d 902, 904 (Tex. 1962). Zanfardino's reliance on Sharp, however,
is misplaced. The Sharp decision merely stands for the proposition that a trustee in the deed of trust
forecloses thereunder as the special agent for both the mortgagor and the mortgagee, and has a duty
to conduct any foreclosure sale in a fair and impartial manner and in accordance with the terms of
the trust instrument. In the present case, Tom Jeffus was never asked to foreclose on the land in
question, nor did a foreclosure ever take place. Further, since the Sharp decision, courts have
consistently held that the trustee in a deed of trust does not owe a fiduciary duty to the mortgagor.
Stephenson v. LeBoeuf, 16 S.W.3d 829, 837 (Tex. App.-Houston [14th Dist.] 2000, pet. denied);
First State Bank v. Keilman, 851 S.W.2d 914, 925 (Tex. App.-Austin 1993, writ denied); see also
Castillo v. First City Bancorporation of Tex., 43 F.3d 953, 960 (5th Cir. 1994) (applying Texas law);
FDIC v. Myers, 955 F.2d 348, 350 (5th Cir. 1992) (applying Texas law). Accordingly, Tom Jeffus
did not owe a fiduciary duty to the Antones by virtue of his office as trustee in the deed of trust. (5)

 A case very recently decided by the Texas Supreme Court disposed of similarly ancient
claims to an interest in the King Ranch property. See Chapman, 2003 Tex. LEXIS 242. The claims
in that case challenged the validity of a 100-year-old land title settlement by asserting extrinsic fraud
and claimed title to land through a trespass to try title claim, while the claims in the case before us
challenge the validity of a forty-eight-year-old deed based on alleged fraud passing between now-deceased ancestors of the parties. Nevertheless, the language used by the Texas Supreme Court in
disposing of the Chapman claims rings true in further support for our disposition of the claims in this
case.

 [W]e conclude that "time, which buries in obscurity all human transactions, has
achieved its accustomed effects upon this." Prevost v. Gratz, 19 U.S. (6 Wheat.) 131,
133 (1821). In this case, the Chapman heirs have cobbled together a series of
interesting historical tidbits and Texas folklore in an effort to regain title to one-half
of the Rincon - an interest they claim is worth a substantial sum. Viewed separately,
each of these tidbits fails to provide evidence of King's extrinsic fraud, and
aggregated, they fare no better. While anything more than a scintilla of evidence is
legally sufficient to survive a no-evidence summary judgment motion, "some
suspicion linked to other suspicion produces only more suspicion, which is not the
same as some evidence." Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 927
(Tex. 1993); Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983) ("When the
evidence offered to prove a vital fact is so weak as to do no more than create a mere
surmise or suspicion of its existence, the evidence is no more than a scintilla and, in
legal effect, is no evidence."). The Chapman heirs' extrinsic fraud claims are
supported, in large part, by the absence of evidence - the dearth of complete records
one hundred twelve years after judgment was entered, and the unavailability of any
living witness to testify to the events at issue. The heirs urge us to second guess, with
benefit of hindsight, the wisdom of settling ancient litigation. We decline to do so. 
As we recognized in 1857, we must apply a presumption in favor of ancient
judgments, particularly those involving land titles, lest the passage of time destroy
them. Baker, 20 Tex. at 437. We cannot conclude that conspiracy theories -
fascinating but unsupported by evidence - may be used to upend a one hundred
twenty year old judgment quieting title to the property. Because the Chapman heirs
failed to produce even a scintilla of evidence of Richard King's alleged extrinsic
fraud, their bill of review fails.


Chapman, 2003 Tex. LEXIS 242, at *29-31. Zanfardino has likewise "cobbled together" fascinating
theories and suspicions, unsupported by any evidence of fraud by Tom Jeffus against the Antones. 
Such theories, without evidence, cannot be used to defeat long-standing title to property.

 There is no evidence Tom Jeffus fraudulently induced the Antones to deed the two tracts to
him. We overrule Zanfardino's point of error and affirm the judgment of the trial court.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: July 16, 2003

Date Decided: September 25, 2003
1. Tom Jeffus was also president of Deport at the time this deed of trust was executed. 
2. In the record is a check in that amount apparently written by John Antone, but Zanfardino's
affidavit concludes that it must have represented proceeds from the sale.
3. By 1999, the Antones were both deceased. 
4. Even if there had been evidence of fraud, we believe the trial court's summary judgment was
proper on the basis of the statute of limitations and of adverse possession. The documentation found
by Zanfardino and other information recounted in her affidavit was information of which the
Antones were actually aware or on notice.

 A four-year limitations period applies to a fraud cause of action. Tex. Civ. Prac. & Rem.
Code Ann. § 16.004(a)(4) (Vernon 2002). Fraud, however, prevents the running of the statute of
limitations until it is discovered or, by exercise of reasonable diligence, it might have been
discovered. Velsicol Chem. Corp. v. Winograd, 956 S.W.2d 529, 531 (Tex. 1997). Parties have
actual knowledge if they have personal knowledge of the terms in the deed. City of Houston v. Muse,
788 S.W.2d 419, 422 (Tex. App.-Houston [1st Dist.] 1990, no writ). Even if, before signing the
deed, the Antones believed they would be asked to convey all or only part of the property to Deport,
they had actual notice when they signed the deed in 1955 that Tom Jeffus was taking title to all of
the property in his individual capacity. See Mooney v. Harlin, 622 S.W.2d 83, 85 (Tex. 1981).

 Under the Texas Civil Practice and Remedies Code, adverse possession is defined as "actual
and visible appropriation of real property, commenced and continued under a claim of right that is
inconsistent with and is hostile to the claim of another person." Tex. Civ. Prac. & Rem. Code Ann.
§ 16.021 (Vernon 2002). The only issue in dispute is when limitations began to run. When a deed
reserves a vendor's lien, possession of the vendee is not adverse to the superior title of the vendor,
and the statute of limitations for adverse possession does not begin to run until the vendor's lien is
released, or the vendee gives the vendor unequivocal notice of repudiation of the vendor's superior
title. Calverly v. Gunstream, 497 S.W.2d 110, 115 (Tex. Civ. App.-Dallas 1973, writ ref'd n.r.e.). 
In 1955, Deport issued a partial release of lien and therein declared its note paid. In 1962, Banker's
released its lien and declared its note paid. We conclude the statute of limitations for adverse
possession began to run in 1962, when the Antones no longer had a valid vendor's lien, and any
Zanfardino claim to title of the land would have been barred by adverse possession regardless of
whether the twenty-five-year or ten-year statute of limitations is applied.
5. Zanfardino also relies on Section 113.053 for the proposition that trustees may not purchase
trust property for themselves. See Tex. Prop. Code Ann. § 113.053 (Vernon 1995). That portion
of the Code, however, expressly provides that it does not apply to "a security instrument such as a
deed of trust . . . ." Tex. Prop. Code Ann. § 111.003 (Vernon 1995). 



FootnoteText, li.MsoFootnoteText, div.MsoFootnoteText
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Footnote Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
p.MsoFootnoteTextCxSpFirst, li.MsoFootnoteTextCxSpFirst, div.MsoFootnoteTextCxSpFirst
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Footnote Text Char";
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
p.MsoFootnoteTextCxSpMiddle, li.MsoFootnoteTextCxSpMiddle, div.MsoFootnoteTextCxSpMiddle
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Footnote Text Char";
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
p.MsoFootnoteTextCxSpLast, li.MsoFootnoteTextCxSpLast, div.MsoFootnoteTextCxSpLast
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Footnote Text Char";
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
p.MsoHeader, li.MsoHeader, div.MsoHeader
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Header Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:none;
 tab-stops:center 3.25in right 6.5in;
 mso-layout-grid-align:none;
 text-autospace:none;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;}
p.MsoFooter, li.MsoFooter, div.MsoFooter
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Footer Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:none;
 tab-stops:center 3.25in right 6.5in;
 mso-layout-grid-align:none;
 text-autospace:none;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:none;
 mso-layout-grid-align:none;
 text-autospace:none;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-bidi-font-family:Tahoma;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
.MsoPapDefault
 {mso-style-type:export-only;
 margin-bottom:10.0pt;
 line-height:115%;}
 /* Page Definitions */
 @page
 {mso-page-border-surround-header:no;
 mso-page-border-surround-footer:no;
 mso-footnote-separator:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") fs;
 mso-footnote-continuation-separator:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") fcs;
 mso-endnote-separator:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") es;
 mso-endnote-continuation-separator:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") ecs;}
@page WordSection1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:1.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") eh1;
 mso-header:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") ef1;
 mso-footer:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") f1;
 mso-first-header:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection1
 {page:WordSection1;}
@page WordSection2
 {size:8.5in 11.0in;
 margin:2.0in 1.0in 1.0in 1.0in;
 mso-header-margin:2.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") eh1;
 mso-header:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") ef1;
 mso-footer:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") f2;
 mso-first-header:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-11-026-CR%20Heath%20v.%20State%20Opinion%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection2
 {page:WordSection2;}
-->











 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-11-00026-CR

                                                ______________________________

 

 

                                         CRYSTAL HEATH,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 354th
Judicial District Court

                                                              Hunt County, Texas

                                                            Trial
Court No. 25944

 

                                                           
                                       

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            Shortly after a Hunt County robbery
at gunpoint at which $500.00 was taken from Icle Mapps, Crystal Heath admitted
to police that she had cash given to her by Antwan Davis, later shown to have
been the individual who actually committed the robbery.  Five hundred twenty dollars in cash was
recovered from Heaths bra.  From Heaths
conviction of aggravated robbery with a deadly weapon[1]
and her sentence of eleven years imprisonment, Heath complains of insufficient
evidenceas to her party status and as to her connection to the weaponto
support her conviction.  She also asserts
ineffective assistance of counsel.  We
affirm because (1) the evidence sufficiently shows Heath was a party to the
robbery, (2) the evidence need not have shown that Heath wielded or knew about
the weapon, and (3) ineffective assistance of counsel does not appear.

(1)        The
Evidence Sufficiently Shows Heath Was a Party to the Robbery

            In the direct aftermath of the
robbery, Mapps followed Davis car while calling the police.  Shortly thereafter, Greenville Police Officer
Randy Gray detained the vehicle Mapps reported having followed and matching the
description given by Mapps.  

            Driving the detained car was Bryana
Bankston, sitting in the front passenger seat was Heath, and sitting in the
back seat was Davis, who matched Mapps description of the robber.  Bankston informed Gray that, during the
pursuit by Mapps, Davis had opened the door. 
Thereafter, police discovered a BB pistol, with its orange muzzle flag
removed, along the course the pursuit had taken.  Heath initially refused to speak to the
police.  After being informed that she
would be searched at the jail, Heath informed the officers that Davis had given
her cash, which she had placed in her bra. 
The police recovered the cash from Heaths bra.  At trial, Heath admitted she was in the
vehicle and admitted the money was found in her bra.  

            Mapps reported that the perpetrator
had sprayed him with pepper spray at the time of the robbery.  The police discovered a bottle of pepper
spray in the Bankston vehicle.  

            Heath denied involvement in the
robbery.  According to Heath, she had
asked Bankston for a ride to the grocery store. 
Davis, who was fifteen at the time of the offense, had been staying
with Heath and had asked to come along. 
According to Heath, Davis claimed that, to pay Heaths bills, Davis
would get some money from his father, who lived at the Charlet Apartments.  At Davis instructions, the trio parked in
front of the apartment complex.  When
Davis returned, Heath testified he was out of breath and told them you can
leave.  Heath testified she did not
think it unusual for Davis to be out of breath. 
According to Heath, she did not find out about the robbery until their
car was stopped by the police.  Heath denied
encouraging Davis to commit the robbery and denied ever seeing the BB pistol.  Heath admitted she had a chance to return the
money.  

            The evidence at trial established
that Davis used or exhibited a BB pistol and that a BB pistol is capable of
causing serious bodily injury.  

            In evaluating the legal sufficiency
of the charged offense, we review all the evidence in the light most favorable
to the trial courts judgment to determine whether any rational jury could have
found the essential elements of the crime beyond a reasonable doubt.  Brooks
v. State, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing Jackson v. Virginia, 443 U.S. 307, 319
(1979)); Hartsfield v. State, 305
S.W.3d 859, 863 (Tex. App.Texarkana 2010, pet. refd).  Our rigorous legal sufficiency review focuses
on the quality of the evidence presented. 
Brooks, 323 S.W.3d at 917
(Cochran, J., concurring).  We examine
legal sufficiency under the direction of the Brooks opinion, while giving deference to the responsibility of the
jury to fairly resolve conflicts in testimony, to weigh the evidence, and to
draw reasonable inferences from basic facts to ultimate facts.  Hooper
v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson, 443 U.S. at 31819); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007)).

            Evidentiary sufficiency should be
measured against a hypothetically correct jury charge.  See
Gollihar v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997).  Malik controls even in the absence of
alleged jury charge error.  Gollihar, 46 S.W.3d at 255.

            A hypothetically correct jury
charge is one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily increase the States burden of proof or
unnecessarily restrict the States theories of liability, and adequately
describes the particular offense for which the defendant was tried.  Malik,
953 S.W.2d at 240.  The hypothetically
correct jury charge cannot completely rewrite the indictment, but such a
charge need not track exactly all of the allegations in the indictment.  Gollihar,
46 S.W.3d at 253.  If the essential
elements of the offense are modified by the indictment, the modification must
be included.  Id. at 254.  The
hypothetically correct charge, however, need not incorporate allegations that
give rise to immaterial variances.  Id. at 256.

            The law as authorized by the
indictment must be the statutory elements of the offense charged as modified
by the charging instrument.  Curry v. State, 30 S.W.3d 394, 404 (Tex.
Crim. App. 2000).  The hypothetically
correct jury charge must include both (1) allegations that form an integral
part of an essential element of the offense, including allegations that are
statutorily alternative manner and means, and (2) material variances.  Clinton
v. State, 327 S.W.3d 366, 36869 (Tex. App.Texarkana 2010, pet. granted); see Gollihar, 46 S.W.3d at 256.  When determining whether a variance is
material, we must consider two questions: 
1) whether the indictment, as written, informed the defendant of the
charge against him or her sufficiently to allow such defendant to prepare an
adequate defense at trial, and 2) whether prosecution under the deficiently
drafted indictment would subject the defendant to the risk of being prosecuted
later for the same crime.  Mantooth v. State, 269 S.W.3d 68, 76
(Tex. App.Texarkana 2008, no pet.).

            A person is criminally responsible
as a party to an offense if acting with intent to promote or assist the
commission of the offense, he solicits, encourages, directs, aids, or attempts
to aid the other person to commit the offense. 
Tex. Penal Code Ann. § 7.02(a)(2)
(West 2011).  A defendant may not be
held accountable as a party without some indication that they knew they were
assisting in the commission of an offense. 
Edwards v. State, 956 S.W.2d
687, 691 (Tex. App.Texarkana 1997, no pet.). 
More than mere presence of the defendant is required to establish
participation in a criminal offense.  Stroman v. State, 69 S.W.3d 325, 329
(Tex. App.Texarkana 2002, pet. refd). 
Further, a defendant may be liable as a party even if the defendant is
not present at the scene of the crime.  See Otto v. State, 95 S.W.3d 282, 284
(Tex. Crim. App. 2003) (finding party liability under Section 7.02(a)(2) even
though defendant not present at scene of crime).  The jury may consider events that occurred
before, during, and after the offense that demonstrate an understanding and
common design.  Ransom v. State, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (op. on
rehg).  The agreement to act together in
a common design can be proven by circumstantial evidence.  Id.  The evidence must show that at the time of
the offense the parties were acting together, each contributing some part
towards the execution of their common purpose. 
Cunningham v. State, 982
S.W.2d 513, 520 (Tex. App.San Antonio 1998, pet. refd).

            The State introduced sufficient
evidence that Heath was a party under Section 7.02(a)(2) of the Texas Penal
Code.  Among the connections were the
identity of the Bankston car, the presence of pepper spray, the cash, the
secretive location from which the cash was recovered, the recovered weapon, and
Heaths behavior with police.

            The record contains sufficient
circumstantial evidence for the jury to conclude an understanding and common
design existed.  Gray testified the route
the car took after leaving the crime scene was not consistent with Heaths
story.  The discovery of the money hidden
in Heaths bra is an unusual circumstance from which the jury could reasonably
conclude Heath knew about the robbery.  A
jury can disbelieve a witness, even when that witness testimony is
uncontradicted.  Henderson v. State, 29 S.W.3d 616, 623 (Tex. App.Houston [1st
Dist.] 2000, pet. refd).  As the trier
of fact, the jury is the sole judge of the credibility of the witnesses and is
free to believe or disbelieve all, part, or none of any witness
testimony.  Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).  Based on the circumstantial evidence, a
rational jury could have disbelieved Heaths testimony and concluded a common
design existed.  The evidence is
sufficient to support Heaths conviction, based on the law of parties, for
aggravated robbery.

(2)        The
Evidence Need Not Have Shown that Heath Wielded or Knew About the Weapon

            As part of her argument, Heath
argues that the State was bound by its allegation that Heath personally used or
exhibited a deadly weapon.  The
indictment alleged:

[HEATH]
INDIVIDUALLY AND ACTING TOGETHER WITH BRYANA BANKSTON AND ANTWAN DAVIS AS
PARTIES TO THE OFFENSE, DID INTENTIONALLY OR KNOWINGLY, WHILE IN THE COURSE OF
COMMITTING THEFT OF PROPERTY AND WITH INTENT TO OBTAIN OR PERMANENTLY MAINTAIN
CONTROL OF SAID PROPERTY THREATEN OR PLACE ICLE MAPPS IN FEAR OF IMMINENT
BODILY INJURY OR DEATH, AND THE DEFENDANT USED OR EXHIBITED A DEADLY WEAPON,
TO-WIT:  A BB PISTOL

 

Heath
argues that the hypothetically correct jury charge would contain the States
allegation that she wielded the weapon herself. 
Because the evidence established that the person who used or exhibited
the deadly weapon was Davis, Heath argues the evidence is insufficient.  The State argues that the hypothetically
correct jury charge would include an instruction of the law of parties and that
the evidence is sufficient based on the law of parties.  Should the hypothetically correct jury charge
permit the application of the law of parties, Heath alternatively argues the
evidence is insufficient because Heath did not know a deadly weapon had been
used or exhibited.

            Under the hypothetically correct
jury charge, the State was not required to establish that Heath personally used
or exhibited a deadly weapon.  The law is
well established that an indictment is not required to allege that the
defendant acted as a party to the commission of the charged offense.  See,
e.g., Marable v. State, 85 S.W.3d
287 (Tex. Crim. App. 2002).  When there
is evidence that the defendant is guilty as a party, a trial court may charge
the jury on the law of parties even if the indictment charges the defendant as
a principal.  Miles v. State, 259 S.W.3d 240, 244 (Tex. App.Texarkana 2008, pet.
refd).  One of the stated justifications
for the hypothetically correct jury charge was that some important issues
relating to sufficiency -- e.g. the law of parties and the law of transferred
intent -- are not contained in the indictment. 
Malik, 953 S.W.2d at 239.  Since Malik,
the Texas Court of Criminal Appeals has reaffirmed that the hypothetically
correct jury charge permits the jury to find the defendant guilty under the
alternative theories of party liability. 
See Vega v. State, 267 S.W.3d 912, 91516 (Tex. Crim. App. 2008); see also Hayes v. State, 265 S.W.3d 673,
681 (Tex. App.Houston [1st Dist.] 2008, pet. refd).

            While the indictment alleges party
liability concerning the elements of robbery and then alleges personal
liability concerning the use or exhibition of a deadly weapon, we are not
convinced, in the absence of a material variance, that the State is obligated
to prove Heath personally used or exhibited the deadly weapon.  As stated above, the State is not obligated
to plead the law of parties.  Unless
Heath demonstrates that the variance is material, there is no reason not to
follow the same rule when the State pleads party liability in part of the
indictment, but not in all of the indictment. 
Such a hypertechnical requirement would be contrary to the purpose of
the hypothetically correct jury charge. 
Heath does not claim that the States allegation resulted in a material
variance.  Thus, the hypothetically
correct jury charge would include criminal responsibility based on the law of
parties.  The State was not obligated to
prove Heath personally used or exhibited a deadly weapon.

            In the alternative, Heath contends
the State failed to prove Heath knew a deadly weapon had been used or exhibited
and that, therefore, the offense proven was simple robbery, not aggravated
robbery.  Heath does not provide any
authority for the proposition that the State, in addition to proving Heath was
a party to aggravated robbery, must also proveas part of the elements of the
offensethat Heath knew a deadly weapon was used or exhibited.  The knowledge element urged by Heath appears
to come from Article 42.12, Section
3g, of the Texas Code of Criminal Procedure,
under which a special deadly-weapon finding under Section 3g can affect
eligibility for judge-ordered community supervision.  We know of no requirement that knowledge of the
deadly weapon be proven as part of the States burden to prove, as an element
of the offense of aggravated robbery, the use or exhibition of a deadly
weapon.  See Tex. Code Crim. Proc.
Ann. art. 42.12, § 3g(a)(2) (West Supp. 2010).

            We, thus, overrule Heaths
multifarious point of error attacking the sufficiency of the evidence.

(3)        Ineffective
Assistance of Counsel Does Not Appear

            Heath also contends that she
received ineffective assistance of counsel because her attorney asked a
question that led to her impeachment with extraneous offenses.  On direct examination, Heath admitted she had
been on community supervision at the time of the robbery for [f]ailing to
I.D.  On redirect examination, Heaths
trial counsel asked, [O]ther than this have you ever been in trouble, and
Heath responded, No, sir.  On re-cross
examination, the State impeached Heath with other prior offenses.  On second redirect, Heath testified she
misunderstood her counsels question. 
Heath contends her trial counsels error constituted deficient
performance and a reasonable probability of a different result exists because
the case hinged on Heaths credibility.

            We evaluate the effectiveness of
counsel under the standard enunciated in Strickland
v. Washington, 466 U.S. 668 (1984).  See Hernandez v. State, 726 S.W.2d 53,
5657 (Tex. Crim. App. 1986).  To prevail
on her claim, Heath must show (1) her appointed trial counsels performance
fell below an objective standard of reasonableness, and (2) a reasonable
probability exists that, but for trial counsels errors, the result would have
been different.  See Strickland, 466 U.S. at 68788.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome.  Mallett
v. State, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).  It is well-settled that any claim of
ineffective assistance must be firmly founded in the record.  Flowers
v. State, 133 S.W.3d 853, 857 (Tex. App.Beaumont 2004, no pet.); see Thompson
v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

            We are unwilling to conclude the
performance of Heaths trial counsel was deficient.  The review of defense counsels
representation is highly deferential and presumes that counsels actions fell
within a wide range of reasonable professional assistance.  Mallett,
65 S.W.3d at 63.  As argued by the State,
Trial counsel could not know that Appellant would lie in her answer, thereby
opening the door for the State to cross examine her on misdemeanor
priors.  Further, trial counsels
reasons for the question do not appear in the record.  If counsels reasons for his conduct do not
appear in the record and there is at least the possibility that the conduct
could have been legitimate trial strategy, we will defer to counsels decisions
and deny relief on an ineffective assistance claim on direct appeal.  Ortiz
v. State, 93 S.W.3d 79, 8889 (Tex. Crim. App. 2002).

            A criminal defendant has a right to
a fair trial, not a perfect one.  [A]n
appellate court should be especially hesitant to declare counsel ineffective
based upon a single alleged miscalculation during what amounts to otherwise
satisfactory representation, especially when the record provides no discernible
explanation of the motivation behind counsels actions.  Thompson,
9 S.W.3d at 814; Williamson v. State,
104 S.W.3d 115, 120 (Tex. App.Texarkana 2003, pet. refd).  Trial counsels performance did not fall
below an objective standard of reasonableness. 
The record does not establish Heath received ineffective assistance of
counsel.

            For the reasons stated, we affirm
the trial courts judgment.

 

 

                                                                        Josh
R. Morriss, III

                                                                        Chief
Justice

 

Date Submitted:          August 1, 2011

Date Decided:             September 15, 2011

 

Do Not Publish

 











[1]See Tex.
Penal Code Ann. §§
29.02, 29.03 (West 2011).